```
            IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARGARET GRANWEHR,              :     CIVIL ACTION
        Plaintiff               :
                                :
    VS.                         :
                                :
JO ANNE B. BARNHART,            :
Commissioner of Social Security,:
        Defendant               :     NO. 05-2221
```

## REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Margaret Granwehr, brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). The parties have filed cross-motions for summary judgment. For the reasons which follow, it is recommended that both motions be denied and the case remanded to the Commissioner.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a fifty-six (56) year-old female born on February 13, 1949 (Tr. 110). She has an eleventh grade education, and past relevant work experience as a telephone solicitor, food service manager, and waitress (Tr. 131, 136). Disability is alleged as of

1

September 2000[1] due to a variety of problems including vertigo, loss of balance, difficulty with concentration, neuropathy in left leg, seizures, and addiction to prescription medications (Tr. 130).

Plaintiff's application was denied initially, and she then requested a hearing before an Administrative Law Judge (ALJ).[2] A hearing was commenced on May 28, 2003, at which, plaintiff, represented by counsel, testified along with a medical expert (ME) and a vocational expert (VE) (Tr. 39-96).  In a decision rendered June 25, 2003, the ALJ determined that plaintiff "suffers from the following severe impairments: an anxiety disorder, a personality disorder, an opiate dependence, degenerative disc disease of the lumbar spine, left leg pain, pneumonia and a respiratory condition" which prevent her from performing her past work as a food service manager and waitress.  The ALJ, however, further determined that plaintiff's impairments do not prevent her from performing her past job as a telephone solicitor.  The ALJ also found that she retains the residual functional capacity to do limited light work.  Thus, she was determined to be not entitled to benefits (Tr. 17-34).

The ALJ's findings became the final decision of the

---

[1]Plaintiff originally alleged disability since November 15, 1999, but amended the date at the administrative to September 2000 (Tr. 78).

[2]This matter was randomly selected by the Social Security Administration to test modifications to the disability determination process.  See 20 C.F.R. § 416.1406 (b)(4)(2000). Accordingly, there was no reconsideration level of review.

Commissioner when the Appeals Council denied plaintiff's request for review on March 11, 2005 (Tr. 8-10). Presently, plaintiff has appealed that decision to this court.

## **JUDICIAL REVIEW**

The role of this court, on judicial review, is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988). "Substantial evidence" is not "a large or significant amount of evidence but rather such relevant evidence as a reasonable mind might accept to support a conclusion." Id. at 664-65. "The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

To establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health and Human Services, 841 F.2d 57 (3d Cir. 1988), quoting Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423(d)(1) (1982). A claimant can establish such a disability in either of two (2) ways: (1) by producing medical evidence that one is disabled per se as a result of meeting or equaling certain listed impairments set forth

3

in 20 C.F.R. Regulations No. 4, Subpart P, Appendix 1 (1987); see Heckler v. Campbell, 461 U.S. 458 (1987); Stunkard v. Secretary of Health and Human Services, 841 F.2d at 59; Kangas v. Bowen, 823 F.2d at 777; or (2) by demonstrating an impairment of such severity as to be unable to engage in "any kind of substantial gainful work which exists in the national economy." Heckler v. Campbell, 461 U.S. at 461; 42 U.S.C. § 423(d)(2)(A).

This method of proving disability requires that the claimant first show that he/she is unable to return to his/her former work due to a physical or mental impairment. Once a claimant has demonstrated that he/she is unable to perform his/her former work, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he/she is able to perform, taking into consideration the claimant's physical ability, age, education and work experience. See Kangas v. Bowen, supra; Rossi v Califano, 602 F.2d 55, 57 (3d Cir. 1979); 42 U.S.C. § 423(d)(2)(A).

This case was decided under the medical-vocational regulations which require a five-step sequential evaluation of disability claims. See generally, Heckler v. Campbell, supra; Santise v. Schweiker, 676 F.2d 925 (3d Cir. 1982). The sequential evaluation considers in turn current work activity, the severity of impairments, the ability to perform past work and vocational factors. 20 C.F.R. §§ 404.1520 and 416.920.

In this case, the Commissioner reached the fourth step of the evaluation and determined that plaintiff was capable of performing her past work as a telephone solicitor. In the alternative, the Commissioner also went to the fifth step and concluded that plaintiff is able to do limited light work.

## MEDICAL HISTORY

The relevant evidence in this case consists of medical reports and testimony which are summarized as follows:

Plaintiff was admitted into Delaware County Memorial Hospital on September 30, 1999 with a diagnosis of degenerative lumbar disease and left lumbar radiculopathy[3]. She subsequently underwent a lumbar diskogram at L3-4, L4-5, and L5-6 performed by Dr. Don Kovalsky. She was discharged on October 1, 1999 (Tr. 247-249).

The record contains a series of update reports from Dr. Kovalsky covering the period from plaintiff's operation through October 2001. He reported on October 29, 1999 that plaintiff continued with back pain and that she complained that pain was "really disturbing her life, making working difficult and caring for children difficult." Dr. Kovalsky's diagnosis was "probable left lumbar radiculopathy from low-grade lumbar instability" (Tr. 246).

---

[3]Radiculopathy- disease of the nerve roots. Dorland's Illustrated Medical Dictionary, Twenty-ninth Edition, 2000, p. 1511.

5

On March 23, 2000, Dr. Kovalsky indicated that plaintiff was being followed for "degenerative disc disease of the lumbar spine with left peroneal neuropathy[4]." He stated further that plaintiff reported that she is able to work while using medication. She had no significant exacerbation of her symptoms, and no complaints of weakness of the lower extremities (Tr. 245). In a number of updated reports in 2000 and 2001, Dr. Kovalsky wrote that plaintiff was in a pain management program for chronic neuropathic pain in the left lower extremity, but was able to "participate in activities of daily living without restriction" while taking her pain medication (Tr. 229-243).

On February 19, 2001, plaintiff had chest x-rays taken at Mercy Community Hospital. Dr. Russ Savit's impression was that "there is interstitial lung disease, greater in the right lung as compared to the left. There are patchy areas of scarring and atelectasis[5] bilaterally" (Tr. 199).

On August 6, 2001, plaintiff entered Crozer-Chester Medical Center to have a lung procedure performed called a "right

---

[4]Neuropathy- a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown. Dorland's at 1212.

[5]Atelectasis- incomplete expansion of a lung or portion of a lung. Dorland's at 166.

6

thoracotomy[6] with biopsy of the right middle lobe and right lower lobe, and mediastinal lymph node biopsy." Dr. Robb Seto, who performed the procedure, gave a postoperative diagnosis of "interstitial lung disease"[7] (Tr. 496-497).

The record also contains several reports from Suburban Pulmonary Medicine. On September 7, 2001, Gerald Meis, D.O., a pulmonologist, examined the plaintiff and reviewed a CT scan of her lungs. He concluded that the plaintiff had "bronchiolitis obliterans with organizing pneumonia.[8] There may be an allergic alveolitis given the peribronchial inflammation" (Tr. 261-268).

Plaintiff was again admitted into Crozer-Chester on October 25, 2001 with respiratory problems. She was discharged on October 29, 2001 with the following diagnoses; "community-acquired bronchopneumonia,[9] rule out alveolitis, anxiety with adjustment

---

[6]Thoracotomy- surgical incision into the pleural space through the wall of the chest. Dorland's at 1834.

[7]Disease (interstitial lung)- a heterogeneous group of noninfectious, non-malignant disorders of the lower respiratory tract, affecting primarily the alveolar wall structures but also often involving the small airways and blood vessels of the lung paraenchyma. Dorland's at 518.

[8]Bronchiolitis (obliterans with organizing pneumonia)- an idiopathic disease combining organizing pneumonia with a condition resembling bronchiolitis fibrosa obliterns. Dorland's at 244.

[9]Bronchopneumonia- an inflammation of the lungs that begins in the terminal bronchioles, which become clogged with a mucopurulent exudate forming consolidated patches in adjacent lobules. Dorland's at 245.

disorder, intermittent vestibulopathy, and chronic pain syndrome" (Tr. 278-279).

Two days later on October 31, 2001, plaintiff, apparently unhappy with her care at Crozier Hospital, got admitted into Temple University Hospital for her respiratory problems. Dr. Darilyn Moyer reported that plaintiff had "hypercapneic respiratory failure secondary to benzodiazepine use but denied suicide ideation." She was given a psychiatric consultation because of possible suicide ideation and was found to be suffering depression, anxiety, and bipolar disorder (Tr. 306-307).

Plaintiff was seen at the Temple Lung Center on December 10, 2001. Dr. Steven Kelson reported that plaintiff suffers with "recurrent pulmonary infiltrates" with questionable etiology. He added that it was possible that plaintiff may also have an "immunogobulin deficience which predisposed her to recurrent pneumonia." Dr. Kelson recommended that plaintiff be weaned off of the pain medication Oxycotin (Tr. 481-485).

X-rays were taken of plaintiff's chest on December 27, 2001. Dr. Barry Suskind gave his impression as "mediastinal and hilar adenopathy[10] as previously described. Bilateral ground glass infiltrates, slightly decreased since the prior examination. Small lung nodule at the right base, unchanged. Subcardinal adenopathy" (Tr. 194).

---

[10]Adenopathy- enlargement of a lymph node. Dorland's at 30.

Plaintiff again was admitted into Temple Hospital on February 5, 2002 with fever and shortness of breath. Dr. Steven Kelsen reported that plaintiff was treated for "community-acquired pneumonia." She was discharged on February 8, 2002 (Tr. 350-352).

Plaintiff had an MRI of the lumbar spine performed on February 20, 2002. Dr. Stephen Kelsen's impression was central disc herniation at T11-12, degenerative disc disease at L5-S1, and a small bulging disc at L4-5 (Tr. 371). An MRI was also performed on her brain. Impression was "minimal small vessel ischemic disease" (Tr. 373).

Plaintiff had more chest x-rays taken on March 7, 2002. This time, Dr. Siskind's impression was "improvement at the right base. Residual scarring or pleural disease remains." Dr. Siskind commented that "there is hazy density at the right lung base, possibly representing scarring or pleural disease" (Tr. 191).

A disability examination was conducted on May 24, 2002 by Dr. Ralph Kaufman at the request of the Pennsylvania Bureau of Disability Determination. Dr. Kaufman noted that plaintiff felt she was addicted to Oxycontin, and went into rehabilitation for detoxification. She reported that her concentration was better and she was more alert without this drug, but she is now in pain. She also described a typical day as trying to do some household chores, cooking dinner, and watching television. Dr. Kaufman found plaintiff's moods to be good, affect bright, and thought process

9

logical and goal-directed. He concluded that plaintiff had "no psychiatric diagnosis." He also filled out a functional capacity assessment and opined that plaintiff has "good" ability in all areas of making occupational adjustments, making performance adjustments, and making personal-social adjustments (Tr. 256-260).

Plaintiff entered a long-term residential rehabilitation facility on May 29, 2002 for "opioid[11]/benzo" dependence. Dr. Joseph Campagna of the Alina Lodge facility gave his impression as plaintiff having opioid/benzo dependence, depression, seizure disorder, and peripheral neuropathy, but no personality disorder (Tr. 377-378).

Plaintiff was given a psychiatric examination at Alina Lodge on June 28, 2002. Dr. Joyce Bailey reported that her speech was coherent and relevant, mood neutral, and affect full and appropriate. Cognitive function appeared to be impaired at least in terms of memory function. Dr. Bailey concluded that plaintiff was a person with "significant physical problems and chronic pain, who is in serious denial of her addiction to Oxycotin and likely, Benzodiazepines." She added that there was no evidence of psychosis, serious depression or disabling anxiety (Tr. 388-389).

On July 17, 2002, plaintiff had a psychological evaluation by Louis Schlesinger, Ph.D. He reported that testing showed plaintiff

---

[11]Opioid- any synthetic narcotic that has opiate-like activities but is not derived from opium. Dorland's at 1271.

to be of approximate "average intelligence with evidence of moderate organicity, and an unusual organic picture. She is experiencing an anxiety disorder with inner tension, more than might be apparent clinically. Testing also shows evidence of a depressive potential or vulnerability. The latter falls under the context of an underlying personality disorder with borderline and passive-aggressive traits." It was recommended that she have psychiatric intervention for anxiety, depression, irritability, and potential agitation, neurological evaluation, and consideration of a long-term halfway house (Tr. 393-401).

Plaintiff was given a disability examination on January 8, 2003 by Dr. Merrill Mirman at the request of the Bureau of Disability Determination. Dr. Mirman indicated that plaintiff complained of vertigo, loss of balance, and pain in her left leg. Impression was "arrhythmia of a cardiac origin," syncope, seizure disorder, and depression. Dr. Mirman further opined that plaintiff is capable to lifting and carrying 20 pounds occasionally, stand and walk one to two hours, and sit eight hours with alternating sitting or standing at her option (Tr. 415-420).

Another MRI was performed on plaintiff's lumbar spine on April 22, 2003. Dr. William Kozin reported that "there has been further collapse of the L1 segment. There is no significant change in the extruded disc at T11-12 and degenerative disc disease at L5-S1" (Tr. 431).

Plaintiff testified at the administrative hearing that she started abusing Oxycotin in 1999, but had not used narcotic medication since her discharge from the Alina Lodge in September 2002. She added that she was an alcoholic, but had not had a drink for more than twenty years until she had a one time relapse in February 2003 and was admitted to an alcoholic treatment program for one week. She is currently attending AA meetings and has not had a relapse since. She testified further that she experiences back pain, shortness of breath, leg pain, feelings of guilt, lightheadedness, and problems with concentration. She added that she cannot do much lifting, but is able to stand and sit comfortably (Tr. 56-77).

A medical expert (ME), Hillel Raclaw, Ph.D., a psychologist, testified at the hearing. Dr. Raclaw reviewed the record and observed plaintiff testified, and opined that her mental impairments were "opioid dependence, currently in remission, anxiety disorder, and personality disorder. Dr. Raclaw found that such conditions were severe for purposes of step two of the evaluation, but did not meet a listed impairment. He further opined that plaintiff had only "minor" limitations in her ability to concentrate for an extended period of time, "might" have "some difficulty" focusing on one task for an entire workday, and "might" need a break or two to finish that work task. She was also capable of following detailed or complex job instructions. Dr. Raclaw

added that plaintiff's mental limitations were the same whether or not she was improperly using prescription medication (Tr. 79-85).

A vocational expert (VE) also testified at the administrative hearing.  The ALJ asked the VE to consider an individual with plaintiff's vocational profile who has the exertional capacity to perform light work that involved standing or walking for two to eight hours in an eight-hour workday, sitting for up to eight hours in this period, allowed for a sit/stand option, and could be performed by an individual who is able to follow detailed or complex job instructions and needed normal breaks during a workday. The VE responded that such an individual could perform plaintiff's past work as a telephone solicitor, and could also perform a number of light work jobs that exist in significant numbers in the national economy including office helper, information clerk, and travel clerk (Tr. 88-90).

## **DISCUSSION**

The Commissioner's findings must be affirmed if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  The role of this court is to determine whether there is substantial evidence to support the Commissioner's decision.  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993).

In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Richardson v. Perales, supra.

In this case, the ALJ found that the medical evidence establishes that plaintiff "suffers from the following severe impairments: an anxiety disorder, a personality disorder, an opiate dependence, degenerative disc disease of the lumbar spine, left leg pain, pneumonia, and a respiratory condition." The ALJ further determined, however, that such conditions did not prevent plaintiff from performing her past work as a telephone solicitor. The ALJ also found that plaintiff retains the residual functional capacity to do limited light[12] work with the restrictions that she gave the VE in her hypothetical at the administrative hearing. She was, thus, found not to be entitled to benefits under the Act (Tr. 32-34). After a review of the record, this court finds that the ALJ's decision is not supported by substantial evidence, and the matter should be remanded to the Commissioner.

In this matter, the medical evidence certainly indicates that

---

[12]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

14

plaintiff suffers with several impairments including a respiratory disorder, a lumbar back impairment, prescription drug addiction, and an anxiety disorder.  Plaintiff argues that the ALJ erred in failing to find that her respiratory impairment met or equaled a listed impairment, and in failing to schedule the testimony of a medical expert (ME) to evaluate whether the combination of her physical and mental impairments met or equaled a listing.  We agree.

Listing 3.07 reads in relevant part:

Bronchiectasis (demonstrated by appropriate imaging techiques).  With:

```
    . . . .B.  Episodes of bronchitis or pneumonia or
hemoptysis (more than blood-streaked sputum) or respiratory
failure (documented according to 3.00C), requiring physician
intervention, occurring at least once every 2 months or at
least six times a year.  Each in-patient hospitalization for
longer than 24 hours for treatment counts as two episodes, and
an evaluation of at least 12 consecutive months must be used
to determine the frequency of episodes.
```

20 C.F.R. pt. 404, subpt. Plaintiff, App. , § 307 B. (2004).

The evidence, here, indicates that plaintiff had several hospitalizations in 2001 and 2002 for episodes of bronchitis and/or pneumonia, and was diagnosed with serious lung problems.  On August 6, 2001, plaintiff was admitted into Crozier-Chester Medical Center to have a lung procedure performed which included a biopsy of the middle and lower lobes.  Dr. Robb Seto gave a diagnosis of "interstitial lung disease" (Tr. 496-497).  A month later on

September 7, 2001, pulmonologist, Dr. Gerald Meis, reported that a CT scan of her lungs showed "bronchiolitis obliterans with organizing pneumonia" (Tr. 261-268).

Another month later on October 25, 2001, she was agin admitted into Crozier-Chester with respiratory problems, and was discharged four days later on October 29, 2001 with "community-acquired bronchopneumonia" (Tr. 278-279).  Two days later on October 31, 2001, plaintiff was admitted into Temple University Hospital and was diagnosed with "hypercapneic respiratory failure secondary to benzodiazepine use" (Tr. 306-307).  In December 2001, she was evaluated at the Temple Lung Center.  Dr. Steven Kelson reported that plaintiff suffers with "recurrent pulmonary infiltrates," and that she may have an "immunogobulin deficiency which predisposes her to recurrent pneumonia" (Tr. 481-485).  In addition, on February 5, 2002, plaintiff was again admitted into Temple Hospital with fever and shortness of breath.  She was discharged on February 8th with a diagnosis from Dr. Kelsen as having "community-acquired pneumonia" (Tr. 350-352).

As noted earlier, plaintiff asserts that the above evidence establishes that plaintiff's respiratory condition meets listing 3.07, and in the alternative, argues that, at the very least, the ALJ was obligated in having medical expert testimony at the hearing addressing the issue of whether this listing was met.  She sets forth that "[W]here the record as a whole as it exists at the time

16

of the administrative hearing fairly raises the question of whether a claimant's impairment is equivalent to a listing, a medical expert should evaluate it." Maniaci v. Apfel, 27 F.Supp. 2d 554, 557 (E.D. Pa. 1998).

Here, we are of the opinion that there was a real issue at the time of the hearing that plaintiff's respiratory problems may have met listing 3.07. The ALJ did obtain medical expert testimony at the hearing, but it was from a psychologist who testified regarding plaintiff's mental impairments. We recommend that this matter be remanded back to the ALJ to elicit testimony from an ME and for he/she to give an opinion whether such respiratory conditions meet this listing.

Moreover, although we opine that the record does not support a finding that any of plaintiff's other medical problems including degenerative disc disease, left leg pain[13], and anxiety disorder considered individually are of a disabling severity, on remand the ME should be asked to render an opinion as to whether such impairments are disabling in combination with plaintiff's

---

[13]Subjective evidence of pain and disability must be considered in determining if a claimant is disabled under the Act. Smith v. Califano, 637 F.2d 968 (3d Cir. 1981). Subjective complaints of pain do not require substantiation by clinical findings, Smith v. Califano, supra; Farmer v. Weinberger, 368 F. Supp. 1 (E.D. Pa. 1973), but they must bear on the claimant's physical status, including adverse objective medical findings, diagnoses and opinions. Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1973), cert. denied, 420 U.S. 931 (1975); Baith v. Weinberger, 378 F. Supp. 603 (E.D. Pa. 1974); see also 20 C.F.R. §§ 1526, 1529.

respiratory condition(s). A reviewing court may remand where relevant, probative, and available evidence was not explicitly weighed in deciding plaintiff's claim. Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).

Therefore, the court makes the following:

## RECOMMENDATION

AND NOW, this       day of            , 2005, it is respectfully **RECOMMENDED** that the Cross-Motions for Summary Judgment be **DENIED** and the matter **REMANDED** to the Commissioner of the Social Security Administration.

_____
**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**